## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 21 2016, 5:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Philip R. Skodinski
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeremy Michael Neloff,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 21, 2016

Court of Appeals Case No. 71A03-1511-CR-1933

Appeal from the St. Joseph Superior Court

The Honorable Elizabeth C. Hurley, Judge

Trial Court Cause No. 71D08-1410-F1-8

**Crone, Judge.**

## Case Summary

[1] Jeremy Michael Neloff appeals his convictions, following a jury trial, for three counts of level 1 felony rape. On appeal, he contends that the trial court abused its discretion in admitting certain evidence. He also asserts that the State presented insufficient evidence to sustain his convictions. Concluding that the trial court did not abuse its discretion and that the State presented sufficient evidence to sustain the convictions, we affirm.

## Facts and Procedural History

[2] The facts most favorable to the verdicts are as follows. On October 18, 2014, A.G.[1] was out drinking beers and watching football at the bars with her friends in South Bend. After driving one of her friends home on the west side of town, A.G. planned to stay the night with her ex-boyfriend rather than driving all of the way back to her home in Bristol. However, at around 3:56 a.m. on October 19, the car A.G. was driving ran out of gas on Grape Road in Mishawaka. Because A.G.'s ex-boyfriend did not answer her call, she decided to just pull over and wait for help.

[3] Meanwhile, Neloff was out driving around with his almost one-year-old son, K.N., in order to help K.N. fall asleep. Neloff pulled his car up behind A.G.'s and offered to help her. He told her that he would drive to a gas station to see if

---

[1] We note that in its appellate brief, the State refers to the victim as "P.G." However, we refer to her as "A.G." based upon her full legal name.

it sold gas cans and then return. Neloff drove away and returned a few minutes later to report that he had found a station that sold gas cans. He offered to drive A.G. to the gas station. Because the presence of his young son in the back seat made her feel comfortable, A.G. agreed to let Neloff drive her to buy gas. As they drove, A.G. and Neloff engaged in "that awkward small talk that you make when you're with a stranger." Tr. at 26.

[4] A.G. "wasn't paying very much attention" to where Neloff was driving, but suddenly realized that they had turned down a dead-end road. *Id.* A.G. started to be concerned because she noticed that there were no houses around and that they were in a wooded area. Neloff claimed that he had made a mistake and that he would just turn the car around. Instead, he turned into a nearby drive, "forcefully shoved the car in park[,]" and grabbed A.G. into a bear hug. *Id.* at 28. A.G. began to struggle and fight. Neloff, who weighed roughly 225 pounds, told her "[D]on't move, don't do it." *Id.* A.G. "completely started to panic" and asked Neloff what he wanted. *Id.* Neloff pulled her over to his side of the car and "proceeded to pull his pants down and shove [A.G.'s] head into his crotch." *Id.* A.G. screamed and kept trying to fight back until she felt "something sharp" on her neck. *Id.* Neloff threatened, "[D]on't move or I will slice you wide open." *Id.* at 29. A.G. believed that Neloff was holding a knife or box cutter to her throat. A.G. feared that Neloff might kill her, so she just "froze" and tried not to make any sudden movements. *Id.*

[5] Neloff forced A.G. to perform oral sex on him. While she was performing oral sex, Neloff pulled A.G.'s pants down and inserted his fingers in both her anus

and her vagina. A.G. continued to cry and scream. This awakened Neloff's young son, and A.G. could hear his son crying from the back seat. A.G. next saw a bright light shining in her face and realized that Neloff was filming her. He asked A.G. her name and age, and she lied and said that her name was "Ashley" and that she was "twenty-one." *Id*. at 30. A.G. was just trying "to survive" at this point. *Id*.

Neloff ordered A.G. to remove the boots that she was wearing. Rather than oblige, A.G. moved as far over into the passenger seat of the car as she could get. Neloff screamed at her to take her "f**king boots" off, so she did. *Id*. at 31. Neloff then climbed on top of A.G. and attempted to have sexual intercourse with her. He inserted his penis inside her vagina and moved "back and forth" in a sexual manner for about four minutes, but he could not maintain an erection. *Id*. Neloff's son was screaming and crying very loud, and Neloff eventually climbed off A.G. Neloff was saying out loud, "[W]hat am I doing, I am not a bad person ... I don't know why I am … what am I doing [?]." *Id*. at 32. A.G. thought that Neloff's sudden claimed confusion and remorse was "very fake," but she decided to just "go with it" since fighting him had not worked. *Id*. A.G. realized that the weapon that Neloff had held to her throat was a screwdriver. A.G. assured Neloff that he was not a bad person and that she knew that he was not trying to hurt her. A.G. asked Neloff to take her to her car, and she promised him that she would not tell anyone what had happened. Neloff began looking around the car while saying, "I can't let you go." *Id*. at 48. A.G. was frantic and started begging Neloff not to kill her.

A.G. brought up God and tried to convince Neloff that maybe God put her in the situation to help him. Neloff seemed to be amenable to this idea and started telling A.G. about his life and his addictions. One of the addictions that he discussed with A.G. was his addiction to voyeurism.

[7] Neloff finally drove to the gas station and purchased a gas can and gas for A.G. He then drove A.G. back to her car and put gas in it. Neloff requested that A.G. spend more time talking with him. She agreed to talk with him but insisted that they park in front of a store that she believed had security cameras. Neloff followed A.G. to the storefront. A.G. wanted to get Neloff's name so that she could identify him to police. Neloff was "regretful," "remorseful," and "apologetic" to A.G. about raping her. *Id*. at 42. She convinced him that she needed his name so that she could be sure that he hadn't ever raped anyone else. He allowed A.G. to look at his identification in his wallet. She memorized as much information as she could. After that, A.G. told Neloff that she needed to leave. Neloff responded, "[S]o I guess I will just go home and wait for the cops." *Id*. at 43. A.G. told him that she had a lot to think about and that she would not feel safe driving away unless he left first. Neloff left, and A.G. drove straight to her ex-boyfriend's house and then to the police station.

[8] Neloff was arrested, and a recorded interview was conducted by Mishawaka Police Department Special Victims Unit Detective Martin Mullins on October 23, 2014. Before the interview, Detective Mullins advised Neloff of his *Miranda* rights. Neloff read along with Detective Mullins and read a portion of the

statement of his rights aloud back to Detective Mullins. He then signed a waiver of rights form. During the interview, Neloff inquired, "There's no way I can speak to a counselor or an attorney before I talk about this?" State's Ex. 12: Appellant's App. at 166. Mullins responded, "That's totally up to … I can't suggest a counselor. I can't suggest an attorney. Those aren't decisions I'm allowed to make." *Id.* at 167. Neloff continued to speak to Mullins but never admitted to raping A.G.

[9] The State charged Neloff with four counts of level 1 felony rape, one count of level 5 felony criminal confinement, and one count of level 6 felony performing sexual conduct in the presence of a minor. Before trial, Neloff filed a motion to suppress arguing that his statements to police during the interview on October 23, 2014, should be suppressed because he invoked his right to counsel. Following a suppression hearing, the trial court denied Neloff's motion concluding that his alleged invocation of his right to counsel was equivocal and ambiguous.

[10] A jury trial was held on August 31 through September 3, 2015. The jury found Neloff guilty of three counts of level 1 felony rape and not guilty of one count of level 1 felony rape. The criminal confinement and performing sexual conduct counts were dismissed. This appeal ensued.

# Discussion and Decision

## Section 1 – The trial court did not abuse its discretion in admitting into evidence Neloff's interview with police.

[11]     Neloff first asserts that the trial court erred in denying his pretrial motion to suppress his interview with Detective Mullins. That issue is no longer viable. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). Because he appeals following a completed trial, the issue before us is properly framed as whether the trial court abused its discretion in admitting the evidence at trial. *Id*. The trial court is afforded wide discretion in ruling on the admissibility of evidence, and we review its ruling only for an abuse of discretion. *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id*. We do not reweigh the evidence, and we consider only the evidence that is either favorable to the ruling or unrefuted evidence favorable to the defendant. *Id*.

[12]     During his recorded interview with Detective Mullins, Neloff inquired, "There's no way I can speak to a counselor or an attorney before I talk about this?" State's Ex. 12: Appellant's App. at 166.[2] Neloff contends that this

---

[2] On appeal, Neloff directs us to other statements that he made later during his interview, which he argues may have also constituted requests for counsel. However, he made no mention of these statements in his motion to suppress and did not call the trial court's attention to these additional statements when he renewed his objection to the admission of the interview at trial. Therefore, his challenge to these additional statements is waived. *See Addison v. State*, 962 N.E.2d 1202, 1211 (Ind. 2012) (a defendant may not argue one ground for objection at trial and then raise new grounds on appeal); *see also Townsend v. State*, 632 N.E.2d 727, 730 (Ind. 1994) (a party waives an issue if it is raised for the first time on appeal).

statement constituted an invocation of his right to counsel and that the interview should have ceased at that point. Thus, he argues that the admission of his interview violated his right to counsel. We disagree.[3]

[13] It is well established that "[i]nvocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States,* 512 U.S. 452, 459 (1994) (quotation marks and citation omitted). While the cessation of police questioning is required once an accused requests counsel, the request for counsel must be unambiguous and unequivocal. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). Indeed, the request must be made with sufficient clarity such that a "reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459.

[14] In *Davis*, the United States Supreme Court determined that the defendant's statement "maybe I should talk to a lawyer" was not an unequivocal request for counsel. *Id*. at 462. In *Taylor v. State*, 689 N.E.2d 699 (Ind. 1997), the defendant stated, "I guess I really want a lawyer, but, I mean, I've never done

---

[3] The State argues that Neloff has waived his argument regarding the admission of the interview by specifically advocating for and agreeing to the admission of a less redacted version of the interview versus a more redacted version that the State initially introduced. We find the State's argument disingenuous, as our review of the record reveals that Neloff renewed his objection to the admission of the interview at trial based upon his motion to suppress, *see* Tr. at 131, and that the discussion and advocation the State is referring to occurred simply because once Neloff knew that the evidence was coming in, he wanted the more complete version admitted.

this before so I don't know." *Id.* at 703. Our supreme court determined that the defendant's statement was "an expression of doubt, not a request" and was merely the suspect choosing to "think out loud about whether to exercise his constitutional right." *Id.* at 703–05. In *Powell v. State*, 898 N.E.2d 328 (Ind. Ct. App. 2008), *trans. denied* (2009), this Court considered the defendant's statement "Could I see about getting a lawyer or something man?" *Id.* at 337. We found the wording of that statement, which was posed as a question to officers, to be ambiguous and not sufficiently clear as to constitute a request for an attorney. We emphasized in *Powell* that officers immediately followed up and asked the defendant if he in fact wanted an attorney. When directly asked, the defendant did not say yes or clarify that he wanted counsel. *See id.*

[15] Neloff's statement here is akin to the statements made in *Davis*, *Taylor*, and *Powell* and was neither unambiguous nor unequivocal. Neloff posed a question to Detective Mullins regarding whether he needed an attorney, and even after Detective Mullins told him that it was a personal decision, Neloff failed to clarify that he wanted counsel. Under the circumstances, we cannot say that Neloff's request was made with sufficient clarity such that a reasonable police officer under the circumstances would understand that Neloff was unambiguously asserting his right to counsel. The trial court did not abuse its discretion when it admitted Neloff's interview with Detective Mullins into evidence.

[16] Additionally, even if the trial court abused its discretion in admitting Neloff's interview with Detective Mullins, any such error was harmless. "[S]tatements

obtained in violation of the federal constitution and erroneously admitted are subject to harmless error analysis." *Anderson v. State*, 961 N.E.2d 19, 28 (Ind. Ct. App. 2012), *trans. denied*. The reviewing court must be satisfied that the error did not contribute to the verdict, that is, that the error was unimportant in relation to everything else the jury considered on the issue in question. *Morales v. State*, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001). In other words, "if the State has presented other overwhelming evidence of the defendant's guilt, then an erroneously admitted statement may be deemed harmless." *Anderson*, 961 N.E.2d at 28.

[17] Our review of Neloff's interview reveals that it is a far cry from a confession of guilt and was generally consistent with his direct testimony at trial in which he did not admit to any nonconsensual sexual contact with A.G. Thus, we cannot say that the interview contributed to his rape convictions. Moreover, as we will discuss more fully later in this opinion, the State presented other overwhelming evidence of Neloff's guilt sufficient to render any error in the admission of his interview with Detective Mullins harmless beyond a reasonable doubt. In short, the admission of the interview was unimportant in relation to the other evidence considered by the jury. Accordingly, we find no error much less reversible error on this issue.

## Section 2 – The trial court did not abuse its discretion in admitting Neloff's testimony regarding a conversation that he had with his wife.

[18]    Next, Neloff relies on the marital privilege doctrine to argue that the trial court abused its discretion in permitting the State to question him during trial regarding a conversation that he had with his wife.[4]  As stated above, the trial court is afforded wide discretion in ruling on the admissibility of evidence, and we review that ruling only for an abuse of discretion.  *Beasley*, 46 N.E.3d at 1235.  Our supreme court has indicated that the marital privilege prohibits "requiring a spouse to testify as to confidential marital communications, but does not bar the spouse from testifying if the spouse chooses to do so."  *Glover v. State*, 836 N.E.2d 414, 422 (Ind. 2005); *see* Ind. Code § 34-46-3-1 (providing that "the following persons shall not be required to testify regarding the following communications…(4) Husband and wife as to communications made to each

---

[4] Although Neloff's wife did testify briefly at trial, she asserted the marital privilege and did not testify regarding any conversations that she had with Neloff.

other."). Under the circumstances presented here, Neloff's reliance on the marital privilege is misplaced and unavailing.[5]

[19] On appeal, Neloff complains about a line of questioning that was initiated by his own trial counsel as a matter of strategy. He was asked by his counsel on direct examination, "Did you tell your wife that you felt like you cheated on her?" Tr. at 185-86. Neloff answered his counsel's question in the affirmative and explained why he made that statement to his wife. Then, on recross, the State asked Neloff follow-up questions about what else he had told his wife during that same conversation, and the trial court permitted Neloff to answer over his counsel's objection on the grounds of marital privilege. We conclude that Neloff voluntarily opened the door during direct examination to further questioning as to the conversation that he had with his wife. Evidence that is otherwise inadmissible may become admissible when the defendant opens the door to questioning on that evidence. *Bryant v. State*, 802 N.E.2d 486, 500 (Ind. 2004). "In order to open the door, the evidence relied upon must leave the trier of fact with a false or misleading impression of the facts related." *Id*. Neloff's

---

[5] Although we need not reach the issue because we conclude that Neloff opened the door to the challenged testimony, we question his ability as the party-spouse to assert the marital privilege to exclude his own testimony regarding what he said to his wife. It is generally accepted under Indiana law that "[b]ecause the marital privilege exists only to protect marriages, only the witness-spouse [as opposed to the party-spouse] may claim the privilege…." 12 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 501.558 (3d. ed 2007) (citing *Glover*, 836 N.E.2d at 416). However, the "leading common law treatises agree that the privilege should belong to the spouse who made the communication, rather than to the spouse to whom the communication is made[.]" *Id.* at n.1 (citations omitted). While our courts do not appear to have specifically considered or adopted this position, we note that the broad language of Indiana Code Section 34-46-3-1(4) certainly implies that the privilege belongs to both spouses regarding communications made to each other.

limited and obviously self-serving answers on direct examination regarding the conversation that he had with his wife left the jury with a misleading impression that the only thing that he said to his wife regarding the early morning in question was that he felt like he cheated on her, when in fact he said much more. The trial court did not abuse its discretion by permitting the State to question Neloff regarding the conversation that he had with his wife.

## Section 3 – The State presented sufficient evidence to sustain Neloff's convictions.

[20] Finally, Neloff contends that the State presented insufficient evidence to sustain his convictions. When reviewing a claim of insufficient evidence, we neither reweigh the evidence nor assess witness credibility. *Bell v. State*, 31 N.E.3d 495, 499 (Ind. 2015). We look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm if there is probative evidence from which a reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *Id.* In short, if the testimony believed by the trier of fact is enough to support the verdict, then the reviewing court will not disturb the conviction. *Id.* at 500. "A conviction can be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim." *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012).

[21] To convict Neloff of level 1 felony rape, the State was required to prove that, while armed with a deadly weapon, Neloff knowingly or intentionally had sexual intercourse with another person or knowingly or intentionally caused another person to perform or submit to other sexual conduct when the other

person was compelled by force or imminent threat of force. *See* Ind. Code § 35-42-4-1. A.G. explained to the jury how Neloff drove her down a deserted road, grabbed her, held a sharp object to her throat, and threatened to slice her "wide open." Tr. at 29. She then testified in great detail regarding how Neloff forced her to perform oral sex on him, attempted to have sexual intercourse with her, and also how he touched her anus and inserted his fingers into both her vagina and her anus. A.G. stated that she feared for her life during her encounter with Neloff.

[22] Neloff points to what he claims are inconsistencies in A.G.'s story and argues that A.G.'s testimony regarding the rapes as well as the other events that occurred that early morning was not believable. The entirety of Neloff's argument is merely a request that we reweigh the evidence and reassess credibility in his favor, tasks not within our prerogative on appeal. The State presented sufficient evidence to sustain the convictions.

[23] Affirmed.

Najam, J., and Robb, J., concur.