


FILED

Dec 16 2024, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

J.I.,

*Appellant*

v.

Ja.I., b/n/f Y.M. (Mother),

*Appellee*

---

December 16, 2024

Court of Appeals Case No.
23A-PO-2789

Appeal from the Marion Superior Court

The Honorable Stephen R. Creason, Judge

Trial Court Cause No.
49D16-2305-PO-18027

---

**Opinion by Judge Brown**
Judges May and Pyle concur.

**Brown, Judge.**

[1] J.I. ("Father") appeals the trial court's protective order. We affirm.

## Facts and Procedural History

[2] Father and Y.M. ("Mother") met in 2006, began living together in 2010, and had a son together, Ja.I. ("Child").[1] Father "exhibited some behaviors that over time became very concerning to" Mother including "regular comments about wanting to commit suicide." Transcript Volume II at 133.

[3] On January 4, 2019, Mother filed a Verified Petition for Dissolution of Marriage under cause number 49D06-1901-DC-429 ("Cause No. 429"). During the divorce process, which was "very long and painful," Father threatened that Mother "would never see [her] kids again, if [she] dared to divorce him." *Id.* at 122. Father also "made all kind of threats to [Mother] to try to discourage [her] from moving forward with it" including telling her that his "only purpose in life is to make your life miserable." *Id.* at 134. Father had a consistent history of "retaliating against [Child's] therapist and causing them to leave for one reason or another" including "harassing them," "making their life miserable," being "impossible to work with," or "making threats of reporting them to the, attorney general or the board." *Id.* at 147. On May 12,

---

[1] On appeal, Father states that Child is ten years old.

2021, Father and Mother divorced. The dissolution court awarded Mother sole legal custody and ordered that she and Father share physical custody.

[4] Jennifer Rothschild met Father on a dating app and they became "somewhere in the middle" between acquaintances and friends.[2] *Id.* at 93. Father "often talked" to her about "his struggles with his mental health" and "[s]eems like most of the time with anxiety, depression, et cetera." *Id.* at 65. Father told her multiple times that "the only joy he gets in life is getting vengeance against people who he feels . . . have wronged him." *Id.* at 87. On May 1, 2023, she had dinner with Father, and he told her that he was "not in a good place mentally," was "having a really hard time lately with his mental health," and "that he had been to his neurologist several weeks before." *Id.* at 69-70. Father said "he had really been having a hard time sleeping because he was having intrusive thoughts and perseverating about his anger towards his ex-wife" and he "was concerned about having that happen with his son in his bed because his son sleeps in his bed with him." *Id.* at 70. He also said that "there were a few times that I just considered taking us both out," which she took to mean Father "considered killing himself and [Child]." *Id.* at 72. Father told her he "was calling [his] therapist the whole time" and "it felt like [Father] was trying to reassure [her] by saying" that. *Id.* at 73. Father said that he told Child that

---

[2] On cross-examination, when asked if she had testified that she was "somewhere in between acquaintance and friend," she answered: "Yeah, and quite honestly, I would say closer to friends. You know, um, yeah, I, I think I considered him a friend, but not a close friend, but also more than acquaintance if that makes sense." Transcript Volume II at 109.

"when he turns 18, he has to make a choice. If he has anything to do with his mother, I will never speak to him again." *Id.* at 75-76. Rothschild was shocked and "just already blown away and in this state of like, I can't believe the things that are being said right now and I said well that is abuse." *Id.* at 76. Father said, "[N]o, her divorcing me is abuse." *Id.* Rothschild said, "[N]o it isn't, um, but telling a child that he's not allowed to love his mother or have a relationship with his mother is emotional abuse." *Id.*

[5] Father said that he did not "wanna get better," that he did not want Child to be an orphan, and that he was waiting until Child turned eighteen years old, and "when he turns 18, I will kill his mother." *Id.* at 77. Father also told her that "just looking at [Child's] face triggers him." *Id.* at 84. Rothschild told Father that she thought he should leave and that she would pay the bill for dinner and walk home. Rothschild blocked Father's phone number, blocked Father on social media, called the police because she felt like she had a responsibility, and made a report with Child Protective Services.

[6] On May 2, 2023, Rothschild sent text messages to Mother informing her of her concerns with Father's statements considering harming or killing Child as well as some threats to harm Mother. Mother was "really scared." *Id.* at 122. Mother and Rothschild spoke over a Zoom call. When Mother saw "a third party, a stranger be that concerned about the safety of [Child], then at that moment," Mother "felt terrified." *Id.* at 126. Mother also had concerns for Child's safety while he was at school because Father made it a habit to show up at Child's school unannounced on a regular basis during her parenting time.

[7] On May 4, 2023, Child, by Mother as his next friend, filed a Petition for an Order for Protection and Request for a Hearing under cause number 49D16-2305-PO-18027 ("Cause No. 18027") which alleged that Father threatened to cause physical harm to Child and committed stalking against Child. The following day, the court entered an Ex Parte Order for Protection which indicated the order would expire on November 25, 2023.

[8] Mother also filed a petition to modify custody under Cause No. 429 on May 4, 2023. On May 23, 2023, Mother filed a Verified Petition for Trial Rule 35 Mental Health Examination under Cause No. 429 requesting that the court require Father to submit to a mental health evaluation with a psychologist appointed by the court.

[9] On May 12, 2023, Father filed a Response to Petition for Order of Protection and Request for Hearing Pursuant to Indiana Code 34-26-5-10 under Cause No. 18027 in which he denied the allegations and asserted that the allegations were made against him with malicious intent.

[10] On May 23, 2023, the court held a hearing. At the beginning of the hearing, the court stated: "We're on the record today in [Cause No. 18027] regarding . . . [Father] and [Child] as well as [Cause No. 429] involving . . . the same party, well, [Father] and [Mother]." *Id.* at 4.

[11] On June 22, 2023, the court held a hearing. At the beginning of the hearing, the court mentioned Cause No. 18027 and also mentioned the motion for "a psychological evaluation in the . . . dissolution." *Id.* at 31. Father's counsel

presented the testimony of Dr. Ryan Overman, a neurologist, who treated Father since 2017 with respect to migraine headaches and some complications of that condition which include mental health issues. When asked if he had any concern as to Father's mental well-being, he answered: "Um, no, I - I do not have any current concerns other than um, I do believe he needs continued treatment, which we've established and planned to continue." *Id.* at 41. He also stated: "I do not have any indication that . . . he is having suicidal ideation or . . . that there is any risk that he would harm someone." *Id.*

[12] Child's counsel presented the testimony of Rothschild and Mother. During cross-examination of Mother, Father's counsel referenced a Department of Child Services ("DCS") report and stated: "And if the . . . report indicated that [Child] reported there was no, he's never heard his father make threats on his life . . . ." *Id.* at 168. Child's counsel objected on the basis of hearsay and indicated that she did not have a copy of the report. Father's counsel argued that "I believe his comments are certainly relevant and the hearsay doesn't apply." *Id.* The court stated that "the reason it's hearsay is that it's secondary hearsay. So, [Child's] comments may, I don't, I don't know if that would necessarily be hearsay, but the report itself is hearsay." *Id.* at 169. Father's counsel argued that it is a business record and asked the court to take judicial notice of it under Evidence Rule 201. Child's counsel objected. The court indicated that it thought it "could take judicial notice of the fact that DCS reached a decision" but "[a]s far as the statements included in that, that cannot be judicially noticed . . . ." *Id.* at 170. After some discussion, Father's counsel

asked Mother: "[W]ould it surprise you if [Child] reported to DCS that he has never heard his father make any sort of threat against him or suicidal ideation?" *Id.* Mother answered: "No." *Id.* at 171.

[13] After the presentation of Child's evidence, Father's counsel moved for an involuntary dismissal, and the court denied the motion. Father's counsel presented the testimony of Peggy Barnes, a licensed clinical social worker who began seeing Father in 2018 with respect to his anxiety. She indicated that she considered Father to be of sound mind and did not consider him to be a threat to himself or others. She testified that she "explored it with him" after the protective order but acknowledged that she did not ask Father if he "made that statement." *Id.* at 201. Upon questioning by the court, Barnes indicated that she was less concerned about whether he actually made the threats and more concerned with Father's current mental state.

[14] On September 20, 2023, Child, by Child's Next Friend, Mother, filed a Verified Petition to Extend Ex-Parte Order for Protection. On October 16, 2023, Father filed a Verified Objection to Extension of Ex Parte Order, a Verified Motion for Rule to Show Cause, and a Verified Objection to Continuance and Motion to Dismiss Action for Failure to Timely Hold a Hearing as Required Pursuant to Indiana Code § 34-26-5-10(c).

[15] On November 2, 2023, the hearing continued. Father testified that he never considered harming himself or others and never threatened to harm others. He testified that DCS completed an investigation and issued a report concluding

that the allegations were unfounded. Father identified a document as the final report issued by DCS, and Father's counsel moved to admit it as Exhibit E. Child's counsel objected, and the court indicated it would not admit Exhibit E because of a lack of foundation. On cross-examination of Mother during her rebuttal testimony, Mother indicated that she went to DCS's office and requested the report and the report indicated that DCS's conclusion was "[un]substantiated." Transcript Volume III at 40.

[16] After the presentation of evidence, the court stated that it did not find the testimony of Father's therapist to be credible and observed that the neurologist did not offer opinions as to Father's current mental health. It found that it believed Father made a threat.[3] The court also stated that it was "open to modifying the amount of supervised parenting time, either by agreement or um, as some time goes on and um, or I receive some other evidence that specifically deals with present mind and, um, treatment on that, that I would find, find credible." *Id.* at 50.

[17] On November 2, 2023, the court entered an Order on Hearing for Order of Protection finding that "[d]omestic or family violence has occurred insofar as [Father] has threatened to cause physical harm to another family member (his son, the Petitioner) without legal justification (see IC § 31-9-2-42) that is

---

[3] The court stated: "I'm going to . . . grant that only on the family violence prong, the domestic and family violence prong. I'm not finding stalking, I'm not finding harassment at this time." Transcript Volume III at 49.

sufficient to justify an issuance of a protective order . . . ." Appellant's Appendix Volume II at 72. On November 8, 2023, the court entered an Order for Protection finding that Father "represents a credible threat to the safety of the Petitioner or a member of the Petitioner's household" and that "[t]he Petitioner has shown, by a preponderance of the evidence, that domestic or family violence has occurred sufficient to justify the issuance of this Order." *Id.* at 87. It listed May 4, 2025, as the date when the order would expire. That same day, the court also entered an "Order for Protection Issued After a Hearing," which indicated that the order would expire on May 4, 2025. *Id.* at 90. On November 22, 2023, Father filed a notice of appeal under Cause No. 18027.[4]

[18] On November 27, 2023, the trial court entered a Scheduling Order under Cause No. 429 indicating that one of the motions that remained pending was the May 23, 2023 Verified Petition for Trial Rule 35 Mental Health Examination. On December 14, 2023, Father filed a Verified Objection to Petition for Trial Rule 35 Mental Health Examination under Cause No. 429.

---

[4] The notice of appeal listed the appealed orders as the November 2, 2023 "Order on Hearing for Order of Protection," the November 8, 2023 "Order for Protection Issued After a Hearing," and a November 8, 2023 "Permanent Order for Protection." Notice of Appeal at 3. The notice of appeal does not appear to include any attached order with the title of "Permanent Order for Protection," and the Appellant's Appendix does not list an order with such a title. The chronological case summary lists a "Permanent Order for Protection" was entered on November 8, 2023. Appellant's Appendix Volume II at 9. Indiana's Odyssey Case Management System indicates that the order listed as a "Permanent Order for Protection" provides that the terms of the order shall be effective until May 4, 2025.

[19] After the parties filed their appellate briefs, Father filed a Verified Motion to Stay Appeal and Remand on July 25, 2024, which requested that we stay the appeal and remand to the trial court pursuant to Ind. Appellate Rules 34 and 37 for the trial court to hold a hearing to consider an evaluation of Father by Jason Hankee, a clinical psychologist.[5] On August 1, 2024, this Court granted Father's motion in part and ordered the trial court "to hold a hearing and reconsider its November 2023 'Order for Protection Issued After a Hearing,' which remains effective until May 4, 2025, in light of the recently released Mental Health Evaluation prepared by Dr. Jason Hankee" and to issue an order either upholding or vacating its prior protective order within twenty days. August 1, 2024 Order at 1.

[20] On August 7, 2024, Father filed a Motion to Reconsider the Order of Protection under Cause No. 18027. Father attached a mental health evaluation by Hankee as Exhibit A. Father asked the court, pursuant to Trial Rule 60(B)(2), to reconsider and vacate the order of protection issued on November 8, 2023. The

---

[5] Father asserted: "To be clear, Father is **not** asking the Court to employ the <u>Logal</u> Procedure that, among other things, would result in the termination of this appeal and impose substantial delay, which is not at all what Father is seeking (unless this Court remands and the trial court vacates the protective order)." Verified Motion to Stay Appeal and Remand at 4. In *Logal v. Cruse,* the Indiana Supreme Court adopted a procedure for disposition of Rule 60(B) motions while a judgment is on appeal. 267 Ind. 83, 86, 368 N.E.2d 235, 237 (Ind. 1977), *cert. denied*, 435 U.S. 943, 98 S. Ct. 1523 (1978). In short, a party seeking to file a Rule 60(B) motion must file a verified petition with the appellate court seeking leave to file the motion. *Id.* If the appellate court determines that the motion has sufficient merit, it will remand the entire case to the trial court for plenary consideration of the Rule 60(B) grounds. *Id.* Such a remand will terminate the appeal. *Id. See also Davis v. State*, 267 Ind. 152, 156, 368 N.E.2d 1149, 1151 (Ind. 1977) (reiterating the procedure set forth in *Logal* for consideration of motions for relief from civil judgments under Rule 60(B)); *Dawson v. Newman,* 845 N.E.2d 1076, 1077 n.1 (Ind. Ct. App. 2006) (noting the procedure for filing a motion for leave to file a Rule 60(B) motion with the trial court under *Logal*), *trans. denied.*

psychological evaluation by Hankee stated in part that "[t]here is no indication from the material obtained that [Father] is in any danger of harming himself or others." Motion to Continue Appeal Exhibit 2 at 19.

[21] On August 15, 2024, the trial court held a hearing. On August 20, 2024, the court entered a five-page Order Denying Motion to Reconsider. The court found that Father's motion invoked Ind. Trial Rule 60(B)(2), Hankee's evaluation and opinions did not meet the criteria for newly discovered evidence, the evidence from Hankee was cumulative, and "the Hankee evidence does not persuade the Court that its judgment in this case was wrong, insofar as newly discovered evidence must be likely to result in a different result at trial." August 20, 2024 Order Denying Motion to Reconsider at 3. The court observed that "[f]or the first time at the August 15 hearing, [Father] also argues that the Court could reopen the judgment under Trial Rule 60(B)(8)." *Id.* at 5.

[22] On August 26, 2024, Father filed a nine-page Verified Notice of Request to Continue Appeal. On August 30, 2024, this Court entered an order granting Father's Verified Notice of Request to Continue Appeal, lifting the temporary stay granted in the August 1, 2024 order, and ordering that the appeal continue in accordance with the Rules of Appellate Procedure.[6]

---

[6] On August 29, 2024, Mother filed a Motion to Strike Portions of Father's Verified Notice of Request to Continue Appeal in which she argued that Father's notice sought to employ the process contemplated by the *Logal* procedure, and Father was now complaining of additional errors, making new arguments, and offering

## Discussion

[23]  In his brief, Father argues that the trial court erred in failing to take judicial notice of DCS's report that there were no disclosures from Child regarding ever hearing Father make threats on his life or witnessing atypical behavior by Father. Father alternatively asks that we take judicial notice of the DCS report pursuant to Ind. Evidence Rule 201(a)(1)(B). He asserts that, contrary to the allegation in Mother's May 4, 2023 petition, Rothschild was never a guardian ad litem. He points out that, while Rothschild testified that she worked for a healthcare company that treats individuals with mental health issues and behavior concerns, she also testified that she merely worked in a "marketing and out-reach" capacity. Appellant's Brief at 26 (quoting Transcript Volume II at 97-99). Father argues that the trial court erred in determining that Mother met her burden of showing that he posed a present, credible threat to Child and members of Child's household.[7]

---

new legal authority despite his failure to request leave to submit an additional brief. She also argued that Father's intent to provide the additional transcript was an impermissible attempt to expand the record and was a violation of Ind. Appellate Rule 32. On September 3, 2024, Father filed a Verified Response to Motion to Strike Portions of Appellant's Verified Notice of Request to Continue Appeal. On September 13, 2024, this Court denied Mother's Motion to Strike Portions of Father's Verified Notice of Request to Continue Appeal.

[7] In his statement of facts, Father asserts: "Notwithstanding the requirement in Indiana Code § 34-26-5-9(d)(2)(B) for 'notice and a hearing' before a court can 'deny parenting time,' the record (in the protective order or divorce proceedings) does not show that the trial court held a 'hearing' before it 'terminated' Father's 'parenting time.'" Appellant's Brief at 12 (citations omitted). While Father again cites Ind. Code § 34-26-5-9(d)(2)(B) in his conclusion, *see id.* at 33, he does not develop an argument in his argument section. We also note that the appealed orders occurred after multiple hearings.

When, as here, a party appeals a trial court's judgment entering a protective order, we apply a two-tiered standard of review—we consider whether the evidence supports the court's findings and, if so, whether those findings support the judgment. *S.D. v. G.D.*, 211 N.E.3d 494, 497 (Ind. 2023). In making these determinations, we neither reweigh the evidence nor determine the credibility of witnesses, and we consider only the evidence favorable to the trial court's decision. *Id.*

"The Indiana Civil Protection Order Act provides Hoosiers and our trial courts with a vital tool to remedy and guard against domestic or family violence in their communities." *Id.* "[T]he Legislature explained the Act's purpose is to protect and keep safe 'all victims of domestic or family violence in a fair, prompt, and effective manner' and prevent such violence in the future." *Id.* (quoting Ind. Code § 34-26-5-1). "At the same time, the 'Act is not one-sided,' as its explicit requirements balance 'the need to protect victims of domestic violence against the interests of those against whom a protective order is sought.'" *Id.* (quoting *S.H. v. D.W.*, 139 N.E.3d 214, 217 (Ind. 2020)). "It is not our trial courts but the Act itself that strikes this balance by requiring the petitioner to make specific showings before a court can issue a protective order." *Id.*

Ind. Code § 34-26-5-2 provides:

> (a) A person who is or has been a victim of domestic or family violence may file a petition for an order for protection against a:

> (1) family or household member who commits an act of
> domestic or family violence; or
>
> (2) person who has committed stalking under IC 35-45-10-
> 5 or a sex offense under IC 35-42-4 against the petitioner.
>
> * * * * *
>
> (c) A parent, a guardian, or another representative may file a
> petition for an order for protection on behalf of a child against a:
>
> > (1) family or household member who commits an act of
> > domestic or family violence;

Ind. Code § 34-6-2-34.5 provides:

> "Domestic or family violence" means, except for an act of self-
> defense, the occurrence of at least one (1) of the following acts
> committed by a family or household member:
>
> (1) Attempting to cause, threatening to cause, or causing physical
> harm to another family or household member.
>
> (2) Placing a family or household member in fear of physical
> harm.

At the time the trial court issued the protective order in November 2023, Ind. Code § 34-26-5-9(h) provided that "[a] finding that domestic or family violence or harassment has occurred sufficient to justify the issuance of an order . . . means that a respondent represents a credible threat to the safety of a petitioner or a member of a petitioner's household" and that, "[u]pon a showing of domestic or family violence or harassment by a preponderance of the evidence, the court shall grant relief necessary to bring about a cessation of the violence or

the threat of violence."[8]  "A court may not deny a petitioner relief . . . solely because of a lapse of time between an act of domestic or family violence or harassment and the filing of a petition."  Ind. Code § 34-26-5-13.  "Ultimately, our trial courts must consider the evidence and determine whether the respondent's actions—viewed objectively at the time the petitioner seeks relief—provide reasonable grounds to believe the threat of violence persists."  *S.D.*, 211 N.E.3d at 499.

[29]  The Indiana Supreme Court recently echoed Chief Judge Altice's observation that, in close cases when the evidence could lead a court to grant or deny a petition, "the trial court is the one to make that call."  *Id.* at 498 (quoting *S.D. v. G.D.*, 195 N.E.3d 406, 411 (Ind. Ct. App. 2022) (Altice, J., dissenting), *reh'g denied*, *trans. granted*).  "Indeed, our trial courts are far better than appellate courts 'at weighing evidence and assessing witness credibility.'"  *Id.* (quoting *Snow v. State*, 77 N.E.3d 173, 177 (Ind. 2017)).  "And this is particularly true in protective order cases, where our trial judges see and hear the parties interact as they relay details about intensely personal, traumatic events."  *Id.*  "Our review of this evidence on appeal is far less clear from our vantage point in the 'far corner of the upper deck.'"  *Id.* (quoting *Snow*, 77 N.E.3d at 177 (quoting *State v. Keck*, 4 N.E.3d 1180, 1185 (Ind. 2014))).

---

[8] Subsequently amended by Pub. L. No. 9-2024, § 527 (eff. July 1, 2024).

The Indiana Supreme Court has expressed a preference for granting latitude and deference to our trial judges in family law matters and explained:

> While we are not able to say the trial judge could not have found otherwise than he did upon the evidence introduced below, this Court as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

*Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)).

To the extent Father's August 7, 2024 Motion to Reconsider the Order of Protection cited Ind. Trial Rule 60(B)(2), we note that Trial Rule 60(B) provides:

> On motion and upon such terms as are just the court may relieve a party or his legal representative from a judgment, including a judgment by default, for the following reasons . . . (2) any ground for a motion to correct error, including without limitation newly discovered evidence, which by due diligence could not have been discovered in time to move for a motion to correct errors under Rule 59 . . . .

We generally review trial court rulings on motions for relief from judgment for an abuse of discretion. *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008), *reh'g denied*. Relief from judgment under Ind. Trial Rule 60 is

an equitable remedy within the trial court's discretion. *In re Adoption of C.B.M.*, 992 N.E.2d 687, 691 (Ind. 2013).

[33] To the extent Father argues that the trial court "erred in not taking judicial notice of the factual finding in the DCS report that 'there were no disclosures from [Child] regarding ever hearing [him] make threats on his life or witnessing atypical behavior by [him],'" Appellant's Brief at 20, like other evidentiary decisions, we review a trial court's decision to take judicial notice of a matter for abuse of discretion. *Dumka v. Erickson*, 70 N.E.3d 828, 831 (Ind. Ct. App. 2017) (citing *Horton v. State*, 51 N.E.3d 1154, 1157 (Ind. 2016)). "An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Matter of K.R.*, 154 N.E.3d 818, 820 (Ind. 2020) (quoting *Beasley v. State*, 46 N.E.3d 1232, 1235 (Ind. 2016)). This Court has recently held that "[e]ven if court records may be judicially noticed, 'facts recited within the pleadings and filings that are not capable of ready and accurate determination are not suitable for judicial notice.'" *In re P.B.*, 199 N.E.3d 790, 796-797 (Ind. Ct. App. 2022) (quoting *Matter of D.P.*, 72 N.E.3d 976, 983 (Ind. Ct. App. 2017) (quoting *Brown v. Jones*, 804 N.E.2d 1197, 1202 (Ind. Ct. App. 2004), *trans. denied*)), *reh'g denied*, *trans. denied*. "Unless principles of claim preclusion apply, judicial notice should be limited to the fact of the record's existence, rather than to any facts found or alleged within the record of another case." *Id.* at 797 (quotation omitted).

[34] Father does not point to the record to suggest that any evidence indicated that he threatened Child directly. Rather, the evidence favorable to the trial court's ruling indicated that Father made statements to Rothschild regarding intrusive thoughts and statements which Rothschild took as Father considered killing himself, Child, and Mother. In light of the record, we cannot say that the trial court abused its discretion or that the exclusion of the DCS report affected Father's substantial rights.

[35] With respect to Father's arguments that Rothschild was not a guardian ad litem and merely worked in a marketing capacity, Rothschild's testimony addressed these aspects. The trial court stated in response to one of the objections to her testimony that she was not testifying as an expert witness. During cross-examination, Father's counsel asked: "Okay, so what you do for your current company, you do marketing. You don't do anything in the mental health field?" Transcript Volume II at 97-98. She answered: "Yes, I do." *Id.* at 98. When asked if that was only because she worked for a company that was in the mental health field and if her job had "to do with mental health," she answered affirmatively. *Id.* She indicated her position was "[m]arketing and outreach." *Id.* When asked if she was a guardian ad litem, she answered: "No, but I think in it in Florida, the volunteer Guardian ad Litem is different than what that means here in Indiana." *Id.* When asked "[w]hat's it mean in Florida," she answered: "In Florida, um, I think they're called CASAs here. It was just a volunteer thing that I did, um, to um, spend time with kids who were in dependency, and just advocate for them, and spend time with them." *Id.* She

also acknowledged: "I may have said I'm not a clinical expert because I'm not. I'm not licensed in any capacity as a clinician." *Id.* at 99.

[36] To the extent Father challenges the sufficiency of the evidence and even considering Hankee's report, we cannot say reversal is warranted. The record reveals that Rothschild testified that Father "often talked" to her about "his struggles with his mental health." *Id.* at 65. He told her multiple times that "the only joy he gets in life is getting vengeance against people who he feels . . . have wronged him." *Id.* at 87. On May 1, 2023, Father told her that he was "not in a good place mentally" was "having a really hard time lately with his mental health." *Id.* at 69-70. He discussed "intrusive thoughts" and his concern about having certain thoughts when Child was in bed with him. *Id.* at 70. He told her that he considered killing himself and Child and that he did not "wanna get better." *Id.* at 77. He also told her that "just looking at [Child's] face triggers him." *Id.* at 84. When asked if she was concerned and took Father seriously, Rothschild answered: "Absolutely. I mean, it was shocking. I mean, it's, especially to say that about your own child is especially terrifying." *Id.* at 73.

[37] Mother testified that "there's only one thing that [Father] could do to [her] that could cause the amount of harm that he apparently wants to cause to [her] and that is to take [Child's] life" and she felt that "by doing that, [Father] would make sure he gets his revenge and that [she] suffer for the rest of [her] life." *Id.* at 134. Mother also testified: "[I]t doesn't sound, that [Father] shared with his doctors, that he's actually having these intrusive thoughts and are really

dangerous." *Id.* at 136. Mother indicated that she had concerns for Child's safety, she was "really worried," and that Father's threats against her and Child "really concerned" her. *Id.* at 151, 153. On recross-examination, Mother stated that "the fact that he threatened to kill me and [Child] and kill himself tells me that he's not doing well." *Id.* at 178. When asked if the testimony from Father's neurologist was not sufficient for her, Mother answered:

> Yeah, there's also the possibility that he's not being fully transparent because he knows if he shares, these things are gonna be reported and you know, in a cost to this situation, you know, he's very concerned the records and what he says for him on records and he, I don't think he wants to be on records with any professionals that he's really saying or thinking these things, unfortunately.

*Id.*

[38] Based upon the record, we conclude that Mother presented evidence of probative value to establish by a preponderance of the evidence that Father posed an objectively credible threat to Child's safety when Mother sought relief.

[39] For the foregoing reasons, we affirm the trial court's order.

[40] Affirmed.

May, J., and Pyle, J., concur.

ATTORNEYS FOR APPELLANT

Alexander Moseley
Dixon & Moseley, P.C.
Indianapolis, Indiana

Bryan H. Babb
Seema Shah
Bose McKinney & Evans LLP
Indianapolis, Indiana

Yvette M. LaPlante
Gonterman & Meyer Law
Evansville, Indiana


ATTORNEY FOR APPELLEE

Kyli L. Willis
Buchanan & Bruggenschmidt, P.C.
Zionsville, Indiana